IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

ALEASE BARBER o/b/o            )
ANASTASIA CIERA BAKER,         )
                               )
        Plaintiff,             )
                               )
    v.                         )        CIVIL ACTION NO. 1:05cv388-C
                               )
JO ANNE BARNHART,              )
Commissioner of Social Security,   )
                               )
        Defendant.             )

## MEMORANDUM OPINION

Plaintiff Alease Barber filed this lawsuit on behalf of her daughter, Anastasia Ciera

Baker ("Anastasia"), to review a final judgment by defendant Jo Anne Barnhart,

Commissioner of Social Security, in which she determined that Anastasia is not "disabled"

and therefore, not entitled to supplemental security income benefits.  Her application was

denied at the initial administrative level.  The plaintiff then requested and received a hearing

before an Administrative Law Judge ("ALJ").  Following the hearing, the ALJ also denied

the claim.  The Appeals Council rejected a subsequent request for review.  The ALJ's

decision consequently became the final decision of the Commissioner of Social Security

(Commissioner).[1]  *See  Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  The parties

have consented to the undersigned United States Magistrate Judge rendering a final judgment

---

[1] Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No.
103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social
Security matters were transferred to the Commissioner of Social Security.

in this lawsuit pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1.  The court has jurisdiction over this lawsuit pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  For the reasons that follow, the court concludes that the Commissioner's decision denying Anastasia supplemental security income benefits should be affirmed.

## I.  STANDARD OF REVIEW

In 1996, the President signed into law the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, which included a new standard for defining child disability under the Social Security Act.  *See* PUB. L. NO. 104-193, 110 Stat. 2105, 2188 (1996).  The revised statute provides that an individual under 18 shall be considered disabled "if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(I)  (1999).  The sequential analysis for determining whether a child claimant is disabled is as follows:

1.  If the claimant is engaged in substantial gainful activity, he is not disabled.

2.  If the claimant is not engaged in substantial gainful activity, the Commissioner determines whether the claimant has a physical or mental impairment which, whether individually or in combination with one or more other impairments, is a severe impairment.  If the claimant's impairment is not severe, he is not disabled.

3.  If the impairment is severe, the Commissioner determines whether the impairment meets the durational requirement and meets, medically equals, or functionally equals in severity an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the impairment satisfies this

requirement, the claimant is presumed disabled.

*See* 20 C.F.R. § 416.924(a)-(d) (1997).

The Commissioner's regulations provide that if a child's impairment or impairments does not meet, or is not medically equal or functionally equivalent in severity to a listed impairment, the child is not disabled.  *See* 20 C.F.R. § 416.924(d) (2003). In reviewing the Commissioner's decision, the court asks only whether her findings concerning the steps are supported by substantial evidence.  *See Brown v. Callahan*, 120 F.3d 1133 (10th Cir. 1997). The ALJ considered all of the evidence available in the record before him and on the basis of that evidence concluded that Anastasia is not disabled.

## II.  DISCUSSION

The plaintiff presents one issue for the Court's review: "[w]hether the ALJ erred by failing to properly evaluate the combined effect of Anastasia's impairments according to Listing 112.05D."  (Pl's Br. at 1).  The plaintiff filed this claim on behalf of Anastasia in May 2003 because Anastasia has a speech impediment and is a slow learner.  (R. 58). Anastasia was born on October 18, 1993 and was ten (10) years old on the date of the hearing before the ALJ.  (R. 50 & 208).

While repeating the first grade, Anastasia was evaluated for individualized services because she needed assistance in speech articulation and language skills.[2]  (R. 99).  As

---

[2] Anastasia's mother met with her teachers to develop an Individualized Education Program ("IEP") for Anastasia on March 26, 2002.  (R. 103).

Anastasia prepared to enter second grade, school officials determined that Anastasia needed continued speech and language services. (*Id*.) Her records reflect that although Anastasia is "a shy but cooperative child," she "frequently will drift off task and start talking 'off' the topic." (*Id*.) In December 2002, Anastasia was performing "below grade level" in language arts and mathematics; she was continued on her IEP to develop her comprehension and maximize her progress. (R. 94-97).

On May 8, 2003, Anastasia was reevaluated for special education services. (R. 105-109). The IEP team ruled out mental retardation as a primary cause of Anastasia's learning disabilities. (R. 108).

During the 2003-2004 school year, Anastasia was shy and quiet. She had good conduct and good effort. (R. 112). She continued to receive services as she "struggled in Language Arts, Reading and Math." (*Id*.). On May 5, 2003, Anastasia was administered the Comprehensive Test of Nonverbal Intelligence ("C-Toni").[3] (R. 113). Anastasia scored in the Average range on the Nonverbal Intelligence Quotient, the Pictorial Nonverbal Intelligence Quotient, and the Geometric Nonverbal Intelligence Quotient. (*Id*.)

Although Anastasia was home-schooled for the fourth grade, she continued speech therapy at Kelly Springs Elementary School. (R. 126) Her progress was noted as "slow

---

[3] The CTONI test is an "unbiased test that measures nonverbal reasoning abilities of individuals for whom most other mental ability tests are either inappropriate or biased. . . . Results of the CTONI are most useful for estimating the intelligence of individuals who experience undue language or fine motor skill difficulties." http://www.proedaust.com.au/details.cfm?number=92

because she has been absent frequently." (R. 138) On March 10, 2004, it was noted that Anastasia "continues to miss her speech sessions." (*Id*.)

Prior to the 2003-2004 school year, on March 26, 2003, Anastasia had a psychological evaluation by Dr. Randall Jordan. (R. 140-141). Her mother reported to him that Anastasia

> just learned to tie her shoes a couple of months ago. She does not know her phone number or her address consistently. She can dress herself and she can bathe herself, but she must have the water adjusted for her and needs help getting in and out. . . . She can make a call if she needs to, but again forgets numbers and addresses.

(*Id*.) During this evaluation, Anastasia took the Wechsler Intelligence Scale for Children, Third Edition ("WISC-III"), and the Slosson Intelligence Test. (R. 140). On the WISC-III, she achieved a verbal IQ score of 73, a performance IQ score of 71 and a full scale IQ score of 70.[4] She also scored 76 on the Slosson Intelligence Test. (R. 140-141). Dr. Jordan opined that Anastasia had borderline intellectual functioning. (R. 141). She was not given any Attention Deficit Disorder ("ADD") type of screening "as none of these symptoms seem to be clinically manifested." (R. 140). In addition, "[w]hile withdrawn and shy, she did not meet any criteria for formal anxiety or depression type disorders." (*Id*.)

On July 5, 2003, Anastasia had a consultative evaluation in conjunction with her application for supplemental security income benefits. (R. 163). She was administered the

---

[4] On April 30, 2003, Anastasia was again administered the WISC-III. At this time, her verbal IQ score was 71, her performance IQ score was 90 and her full scale IQ score was 78. However, because she had been administered the same test one month earlier, these scores were determined to be invalid. (R. 105).

OWLS test.[5]  Speech pathologist Patsy Clearman noted that Anastasia was not motivated and her test scores were probably lower as a result of her low motivation.  (R. 164).  Nonetheless, the pathologist's impression was that Anastasia's "comprehension skills and expressive language skills have greater than 25% deficits."  (*Id*.)

On June 26, 2003, Dr. Jordan evaluated Anastasia for ADD.  (R. 180).  He administered the Gordon Diagnostic System, Frontal Lobe Protocol, Hand Sequencing Test, and ADD Questionnaire.  (*Id*.)  Dr. Jordan concluded as follows.

> Overall, ADD processes are being seen or demonstrated.  However, this patient has such a high level of shyness, it is difficult to really say if in fact she absolutely is ADHD.  At this point in time, I would defer to a physician for medication, possibly.  I do feel as if might be worth while to have a trial of stimulant medication.

(*Id*.).  He diagnosed Anastasia with ADD, provisional, and borderline intellectual functioning.  (*Id*.).  Dr. Jordan recommended that Anastasia try a stimulant medication.  Dr. Sester, Dr. Jordan's partner and Anastasia's treating physician, then prescribed a trial of stimulant medication.  (R. 182).  Dr. Sester also noted that it was "[d]ifficult to determine whether child's problems in school are related to her shyness or inattentiveness."  (*Id*.).  She also noted that Anastasia was "very shy " with "borderline IQ."  (*Id*.)

Anastasia was again home schooled during the 2004-2005 school year.  Her speech therapist noted that Anastasia "is not expected to achieve her speech goals" due to her "many

---

[5]  The OWLS test is an "Oral and Written Language Scales" test designed to measure the receptive and expressive language skills of children.

absences." (R. 196). By January 15, 2005, Anastasia had only attended three sessions although she was scheduled to attend every week. (*Id*.)

At the administrative hearing, Anastasia's mother testified that, at age ten, Anastasia has been home schooled for a year. (R. 208). Her mother testified that Anastasia is "very difficult to teach" because "I have to sit there and make sure that she is doing her work without looking around and gazing off,  . . . not paying attention." (R. 209). Anastasia is taking medication for ADHD, "to help her stay focused." (R. 209). Her mother testified that it is difficult for Anastasia to make friends, and she is very, very shy. (R. 210-11).

After a hearing, the ALJ concluded that Anastasia suffers from severe impairments of speech/language delays, borderline intellectual functioning and "an Attention Deficit Disorder without hyperactivity." (R. 18). He further concluded that Anastasia did not have an impairment or combination of impairments that met or medically equaled a Listing. The ALJ properly then considered whether her impairments were "functionally equal" a level of severity in a Listing. (R. 20-21).

In order to functionally equal a listing, Anastasia's impairments must result in "marked" limitations in two or more of six functional domains or "extreme" limitation in one functional domain. 20 C.F.R. § 416.926a(a). These six functional domains are set forth in the applicable regulations: Acquiring and using information; Attending and completing tasks; Interacting and relating to others; Moving about and manipulating objects; Caring for yourself; and Health and physical well-being. *Id*. at 416.926a(b).

The ALJ concluded that Anastasia has "less than marked limitation" in the domain of acquiring and using information.  (R. 23).  The ALJ "acknowledge[d] that the claimant may have some slight deficits in acquiring and using information, particularly given her Borderline intellectual functioning as evidenced by IQ test scores."  (*Id*.).  However, based primarily on her performance while in school,[6] the ALJ found that the claimant's functional limitations did not rise to the level of a "marked" or "extreme" limitation.  (*Id*.)

The ALJ concluded that Anastasia has "less than marked limitation" in the domain of attending and completing tasks, interacting and relating to others, and health and well-being.  (R. 24-25).  He further concluded that Anastasia has no limitation in the domains of moving about and manipulating objects and self-care.  (R. 25).  The ALJ concluded that Anastasia does not have an extreme limitation in one area of functioning, nor does she have a marked limitation in two areas of functioning.  (R. 26).  The ALJ reached the following findings and conclusions.

> When the claimant's functioning is compared to functioning of children who do not have impairments, there appears to be no significant drop-off regarding her overall physical and mental abilities.  The Administrative Law Judge has considered the combined effects of the claimant's impairments and has indicated functional limitations in the appropriate domains as described above.
>
> The Administrative Law Judge finds that, despite the applicant's earlier allegations as to the severity of the claimant's condition, there is documentary evidence which refutes her claims.  There is no evidence suggesting that the claimant is receiving any significant degree of help in performing age-appropriate activities that is more than would be expected for a normal child

---

[6] That Anastasia made "mostly D's and F's" in second grade is not evidence of a marked limitation.

her age.  Furthermore, there is no evidence of any significant medicinal or treatment-related side effects which adversely affect the claimant's functioning.  The claimant has attended school in a regular classroom setting and has not had any intensive therapy, either in or out of the school environment, due to the effects of her condition.

The evidentiary record reflects that the claimant does not have any chronic illness that has produced severe limitations over an extended period of time. The claimant has not engaged in any early intervention program.  There is no evidence of record, which indicates that the claimant's treatment has adversely affected her ability to function over a period of time.  The record establishes that when the claimant so desires, she can initiate, sustain and complete activities.  The claimant's impairment does not require treatment over a long period of time (at least a year), under circumstances where the treatment itself (*e.g.*., multiple surgeries) results in marked and severe functional limitations. The record also reflects that the claimant was able to function in an unfamiliar setting, such as the hearing.

.        .        .

To summarize, the claimant does not have an "extreme" limitation in one area of functioning or "marked" limitation in two areas; therefore, based it cannot be concluded that the claimant is disabled on the basis that he (sic) has impairments that are <u>functionally</u> equivalent in severity to any listed impairment.  Therefore, the undersigned concludes that the claimant does not have either an impairment, or combination of impairments, that meets, medically equals, or functionally equals any of impairments listed in Appendix 1, Subpart P, of Regulation No. 4.

(R. 26).

Anastasia argues that the ALJ failed to properly evaluate whether she meets Listing 112.05D.  (Pl's Br. at 4).  Specifically, the plaintiff argues that because she suffers from speech/language delays and ADD which are severe impairments, coupled with her I.Q. scores, she meets the functional equivalence of Listing 112.05(D).  (*Id.*)  Listing 112.05 relates to mental retardation.

112.05  *Mental Retardation*:  Characterized by significantly subaverage

9

general intellectual functioning with deficits in adaptive behavior.

The required level of severity for this disorder is met when the requirements in A, B, C, D, E, or F are satisfied. . . .

D.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant limitation of function; . . .

20 C.F.R. Pt. 404, Subpt. P App. 1.  A claimant meets the strictures of 112.05D by presenting evidence of (1) a sub-average general intellectual functioning with deficits in adaptive behavior;[7] (2) valid IQ score of 60 to 70 inclusive; and (3) evidence of an additional mental or physical impairment that has more than a "minimal effect" on the claimant's ability to perform basic work activities.  *Lowery v. Sullivan*, 979 F.2d 835 (11th Cir. 1992); *Edwards v. Heckler*, 755 F.2d 1513, 1517 (11th Cir. 1985)

It is undisputed that Anastasia has a full scale score of 70 on the WISC-III.  (R. 140).  However, in this circuit a claimant's IQ score is not conclusive evidence of mental retardation, particularly when the score is inconsistent with other evidence of the claimant's

---

[7]  "Deficits in adaptive behavior" relates to the ability of people to interact and function on a daily basis.

Adaptive behavior refers to those social and practical skills that people use to effectively function in their everyday lives. These include skills in such areas as communication, social interactions, taking care of oneself, managing money, and using transportation, among others. Various tests of adaptive behavior assess skills by either observing the individual in situations where these skills are required, or by interviewing those who know the individual well.

http://ericec.org/digests/e637.html

Counsel argues that the use of the phrase "deficits in adaptive behavior" is simply a description of the condition; it does not set forth the elements of 112.05D.  The court disagrees.  This paragraph defines what constitutes mental retardation under this Listing.  Sections A, B, C, D, E, and F of the Listing go to the *severity* of the impairment, not the existence of it.

daily activities and behavior.  *See Popp v. Heckler*, 779 F.2d 1497 (11th Cir. 1986).  In *Popp*, the Eleventh Circuit Court of Appeals held that the Listings for mental retardation do not require the Commissioner to make a finding of mental retardation based upon the results of an I.Q. test alone.[8]  The test results must be considered in context with other evidence including the daily activities and behavior of the claimant.  *Id.* at 1499.       Furthermore, Social Security POMS Section DI 24515.055 discusses evaluation of cases involving mental retardation and use of psychological or psychometric testing.

> In the adjudication of cases involving alleged mental retardation, accurate information pertaining to the claimant's daily activities and current behavior is required in order to determine the level of impairment severity. . . . Mental retardation must be manifested by severe mental and social incapacity as evidenced by marked dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions such that the use of standardized measures of intellectual functioning is precluded.

Consequently, the ALJ must review the test results in conjunction with the other evidence in the record of the child's behavior and daily activities including reports of teachers or testimony at the hearing.  The ALJ's decision is reviewable by the court for substantial

---

[8]  To the extent that the plaintiff argues that the ALJ erred in failing to find Anastasia's limitations "marked" because her WISC III scores fall "two or more standard deviations before the mean," she is entitled to no relief on this basis.  "[T]he regulations require more than an IQ score that is three standard deviations below the mean in order to classify an impairment as 'extreme,'" *Cf Moore v. Barnhart*, 413 F.3d 718, 723 (8th Cir. 2005); *Scales v. Barnhart*, 363 F.3d 699, 704 (8th Cir. 2004) ("Having one raw score at the borderline of three standard deviations below the mean does not *require* a finding of extreme limitation.") (emphasis in original).

In addition, while the regulations expect " marked" limitations with standardized testing scores  at least two deviations below the mean, the regulations do not mandate a finding of "marked" limitations on that basis alone.  *See also* 20 C.F.R. § 416.926a(e)(ii)(2).  In fact, the regulations repeatedly reiterate that the Commissioner will consider all the relevant information" in each case, including test results and descriptions from parents, teachers and other individuals.  20 C.F.R. § 416.926a.

evidence.

In this case, the ALJ concluded that although Anastasia has deficits in acquiring and using information as a result of her borderline intellectual functioning, her limitations do not rise to the level of marked or extreme. (R. 23). Substantial evidence supports the ALJ's determination. None of Anastasia's physicians nor any of the consultative psychologists who evaluated Anastasia diagnosed her as being mentally retarded. None of her teachers suggest that Anastasia may be suffering from mental retardation. If fact, Anastasia's IEP team ruled out mental retardation as a primary cause of Anastasia's learning disabilities. (R. 108).

In addition, Anastasia's mother completed a "Function Report" for Anastasia in which she states that Anastasia can read, print, add and subtract, and tell time. (R. 68). The only deficits in Anastasia's "ability to progress in learning" noted by her mother were an inability to read and understand simple sentences, stories in books and magazines, inability to write a simple story and an inability to understand money. (*Id*.) Anastasia can walk, run, throw a ball, ride a bike, jump rope, use scissors, work video game controls and dress and undress dolls. (R. 69). Anastasia has friends her own age, can make friends, gets along with others and can play team sports. (R. 70). Although Anastasia has only recently learned to tie her shoes, she is able to use zippers by herself, button her clothes, take a shower or bath by herself, brush her teeth, comb her hair, help around the house, follow direction, and finishes projects. (R. 71-73).

Anastasia's grandmother also completed a "Function Report." Her grandmother

reports that Anastasia can read some, print some, add and subtract, and knows the days of the week.  (R. 87).  Anastasia can walk, run, throw a ball, ride a bike, jump rope, use scissors, work video game controls and dress and undress dolls.  (R. 88).  Her grandmother confirmed that Anastasia has friends her own age, can make new friends and gets along with others.  (*Id.*)

At the administrative hearing, Anastasia's mother expressed concern that Anastasia has trouble riding a bicycle.[9]  When asked to describe Anastasia's limitations, her mother testified that Anastasia is extremely shy; she has difficulty making friends because they make fun of her speech; her memory is not good; and she needs help with her hair and adjusting the bath water temperature.  (R. 210-218).  These limitations are insufficient to support a finding that she has an extreme or marked limitation of functioning in any of the six domains sufficient to meet, medically equal, or functionally equal a Listing.  Unquestionably, Anastasia has some degree of limitation acquiring and using information and interacting and relating to other based on her borderline intellectual functioning and her speech/language delays.  However, the evidence does not support a finding that Anastasia has an "extreme" or "marked" limitation in these or any other areas of functioning.  In addition, Anastasia's mother's testimony does not support a finding that Anastasia has a marked or extreme limitation in any of the areas of functioning.

---

[9]  When asked about riding a bike, her mother testified that "she have trouble sometime with a bicycle, staying balanced on the bicycle.  And so I do have to watch her constantly and there was time whenever she had gotten on the bicycle and she pedaled and ran into the bushes."  (R. 213.)

In brief, the plaintiff argues that the ALJ "erred as a matter of law by not obtaining a medical expert opinion to determine whether Anastasia's impairments medically equal a listing." (Pl's Br. at 7). The ALJ was required to "consider all relevant" information before making a determination. The regulations do not require the ALJ to secure a medical expert to testify, and the ALJ is not required to secure medical expert testimony unless the record demonstrates that such testimony is necessary for the ALJ to render a decision. *See* POMS Section DI 24515.055 ("At the hearing level, the testimony of a medical or psychological advisor or vocational expert *may* be required.") (emphasis added). The record clearly contains sufficient evidence from which the ALJ could determine the plaintiff's level of mental functioning. Thus, the court concludes that, on this record, the ALJ did not err by failing to secure medical expert testimony to determine medical or functional equivalence.

To the extent that the plaintiff argues that her ADD is sufficient to support a "marked" or "extreme" limitation, she is entitled to no relief. First, Dr. Jordan's diagnosis of ADD is provisional; he was unable to determine whether she is extremely shy or ADHD. (R. 180). Next, Anastasia's GAF scores do not indicate a marked or extreme limitation in functioning as a result of any ADD processes she may be experiencing. On March 26, 2003, Dr. Jordan opined that Anastasia's GAF score was 65. (R. 141). On June 26, 2003, he assessed her score at 70. (R. 180). A score of 70 on the Global Assessment of Functioning (GAF) Scale (DSM - IV Axis V) suggests "[m]ild symptoms in one area OR difficulty in one of the following: social, occupational, or school functioning. BUT, the person is generally

functioning pretty well and has some meaningful interpersonal relationships."

http://www.gpc.peachnet.edu.

Finally, the court addresses the issue of whether the ALJ failed to properly evaluate whether Anastasia meets, medically equals or functionally equals Listing 112.05D. Although the ALJ did not state, in his opinion, that he specifically evaluated the plaintiff's impairments within the parameters of Listing 112.05D, the ALJ stated that he considered the plaintiff's impairments in conjunction with the Listings.  (R. 18)

> The Administrative Law Judge finds that the child does not have an impairment which meets or medically "equals" the severity of a listed impairment; therefore, it must be determined whether the child's impairments are functionally equivalent in severity to any listed impairment.  In making this determination, the functional limitations resulting from the claimant's impairments will be compared with the functional limitations which result listed impairments, whether or not related to the claimant's specific medical condition.

(*Id.*).  The ALJ then considered the severity of all of Anastasia's impairments, and concluded that the plaintiff does not meet any of the Listings, including 112.05D.  Accordingly, this claim has no merit.

In short, the ALJ's conclusion that Anastasia is does not functionally meet Listing 112.05D is supported by substantial evidence and, thus, the decision of the Commissioner should be affirmed.

## CONCLUSION

The court has carefully and independently reviewed the record, and concludes that the

15

decision of the Commissioner is supported by substantial evidence.

A separate order will issue.

Done this 30th day of December, 2005.


_____/s/Charles S. Coody_____
CHARLES S. COODY
CHIEF UNITED STATES MAGISTRATE JUDGE

16